# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

H.G.B., a minor, by and through her mother ]
and next friend, K.S.B., and K.S.B., individually, ]
    Plaintiffs, ]
       ]
v. ]
       ]
WILSON COUNTY BOARD OF EDUCATION, ]
    Defendant. ]

## COMPLAINT

### INTRODUCTION

1. Accommodation is not a synonym for exception. It does not mean a student escapes the rules. It means the rules are applied with enough awareness of her disability to produce a fair result rather than a discriminatory one. Wilson County never understood that distinction. This case is the proof.

2. H. G. B. is thirteen years old. She has Generalized Anxiety Disorder and Selective Mutism. These are not preferences or sensitivities. They are diagnosed conditions that limit, in clinically documented ways, her ability to communicate, self-advocate, and access school in the manner her peers do. Federal law has a name for that. It is called a disability. And federal law has a response. It is called accommodation.

3. H. and her mother did not ask for exemption from school rules. They asked for something narrower and more modest: that before the district imposed a consequence on H., it first ask one question — did her disability cause or contribute to what happened? A pause. A review. A moment of individualized consideration before the hammer fell.

4. The district said no. In writing. At the highest levels.

5. That refusal is the center of this case. Everything else, the golf team removal; the failing grade; the panic attack; the truancy threat; and, the missed dance, flows from it. Each of those harms has the same origin. The district established, in March 2025, that it would not ask whether H.'s disability was relevant before it acted. It confirmed that position in writing in August. It then applied it without variation, without reconsideration, and without regard to the mounting evidence of harm, across every consequential decision it made through the end of the school year. Golf was the first time. The failing grade, the panic attack, the truancy letter, the missed dance came after. The district would make that same choice many more times before the year was done.

6. Each harm was foreseeable. Each harm was preventable. The district had committed, institutionally and in writing, to treating H. identically to her non-disabled peers and had decided that this commitment was not only permissible but required. H. herself put it plainly. In her words: it felt like they thought she was making it all up. She lost golf. She couldn't do school. And even on homebound, it was the same thing. Three settings. Three moments when the district had to decide whether her disability was real and worth considering. Three times it decided by action, by inaction, and by written policy that it was not. This case is proof that she was not making it up.

7. It is not. Section 504, Title II of the ADA, and the Equal Protection Clause do not require identical treatment. They require equal access. Those are different things. The district's confusion between the two is not a technicality. It is the violation.

8. This action seeks to correct it.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights), and pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq., and 42 U.S.C. § 1983.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in Wilson County, Tennessee, which is within the Middle District of Tennessee, Nashville Division.

11. Defendant Wilson County Board of Education is a recipient of federal financial assistance within the meaning of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and is therefore subject to the requirements of that statute.

12. No exhaustion of administrative remedies is required for H.'s claims under Section 504 or Title II of the ADA. H. is a Section 504-only student and has never been eligible for or subject to the Individuals with Disabilities Education Act (IDEA).

## PARTIES

13. Plaintiff H. G. B. is a minor, born April XX, 2012, and a resident of Wilson County, Tennessee. She brings this action by and through her mother and next friend, K. S. B. H. was enrolled as an eighth-grade student at West Wilson Middle School in Wilson County, Tennessee. She is a qualified individual with a disability within the meaning of Section 504 of the Rehabilitation Act, 29 U.S.C. § 705(20), and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131(2).

14. Plaintiff K. S. B. is H.'s mother, legal guardian, and next friend, and a resident of Wilson County, Tennessee. She brings this action both as H.'s next friend and in her individual

capacity for violations of her own federally protected rights. Mrs. B. is a credentialed professional holding designations as a Speech-Language Pathologist (M.S., CCC/SLP) and RESNA Assistive Technology Professional (ATP). She has been, at all relevant times, the primary advocate for her daughter's educational rights.

15. Defendant Wilson County Board of Education is a local educational agency and recipient of federal financial assistance within the meaning of 20 U.S.C. § 7801(26) and 29 U.S.C. § 794. Defendant operates West Wilson Middle School, located at 995 North Mt. Juliet Road, Mt. Juliet, Tennessee 37122, and is responsible for ensuring compliance with Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act at all schools within the Wilson County Schools system.

16. At all relevant times, the following individuals acted as agents, employees, and representatives of Defendant within the scope of their authority: Joshua Johnston, Principal of West Wilson Middle School; Amy Hill, Assistant Principal of West Wilson Middle School; Jessica Cantrell, School Counselor and 504 Case Manager; Becky Adams, Wilson County Schools 504 Coordinator; Amber Gailbreath, Middle School Instructional Supervisor; Tracey Burge, Special Education Supervisor; Bryan Adams, Deputy Director of Student Services; Lauren Hoskins, Golf Coach; Jeff Luttrell, Director of Schools; and the Wilson County Schools Staff Attorney. Their conduct, described herein, was undertaken in their official capacities as agents of Defendant.

## FACTUAL ALLEGATIONS

### A. H.'s Disability Profile and Medical History

17. H. G. B. has been diagnosed with Generalized Anxiety Disorder (GAD) and Selective Mutism since at least 2019. Both conditions are recognized disabilities that substantially

limit her major life activities, including but not limited to: verbal communication, particularly under conditions of stress, social scrutiny, or unfamiliar adult authority; self-advocacy and the initiation of requests for help, clarification, or support; emotional regulation in response to perceived threats, confrontation, unexpected changes, or disciplinary situations; academic engagement during and following anxiety episodes, freeze states, or shutdown responses; and participation in standard meeting environments, particularly those that are adult-dominated, adversarial, or involve any threat of consequence.

18. Selective Mutism, as H. presents it, is not willful silence. It is an involuntary, anxiety-based failure of verbal output that occurs specifically in social performance contexts; including classrooms, hallways, administrative offices, and any environment where H. perceives she may be evaluated, judged, or penalized. Her selective mutism is context-dependent and fluctuating: she can speak comfortably at home and in low-stakes environments, but freezes in the very school settings where she most needs to communicate.

19. H.'s GAD involves involuntary fight-flight-freeze neurological responses to perceived threats. In a freeze state, H.'s prefrontal cortex, the region responsible for reasoning, initiation, and decision-making, temporarily shuts down. She is not choosing to be unresponsive. She is neurologically incapable of initiating action until the threat cue resolves. This is a medically documented feature of her disability, confirmed by her treating psychiatrist and relevant to virtually every adverse event described in this Complaint.

20. Before August 2024, H. had no disciplinary history. She was an A/B student. She had no significant incidents at school. That is the baseline. What followed was not the emergence of a troubled child. It was the predictable consequence of a disability that went

unaccommodated and then, when accommodation was sought, was actively refused. The disciplinary events, the golf removal, the academic collapse, the accommodation failures are not explained by longstanding behavioral deficits or disengagement. H. did not change. The demands on her did. Her anxiety and selective mutism required disability-informed support and reasonable modifications. The district declined to provide them. Her treating physicians documented what happened next: escalating distress, functional decline, and ultimately a complete medical removal from school. The district made each of those outcomes more likely. It made none of them less.

21.    Beginning in approximately June 2024, H.'s treating physicians initiated medication management for her anxiety disorder. Multiple medications and dosage adjustments were undertaken over the following months, each producing documented side effects including impulsivity, emotional blunting, and behavioral dysregulation. They were all foreseeable, all communicated to H.'s school in writing, and all clinically confirmed as manifestations of her disability and her treatment.

**B.  The December 2024 Disciplinary Incident and Manifestation Determination**

22.    In September through December 2024, H.'s first-ever disciplinary incidents of any significance coincided precisely with the initiation of fluoxetine medication for her anxiety disorder and the documented side effects of that medication. On December 11, 2024, H. received an Out-of-School Suspension (OSS) in connection with an incident that occurred during the period of active medication side effects.

23.    On December 17, 2024, the district convened a Manifestation Determination Review (MDR) as required by applicable federal law. The MDR team, including district personnel and H.'s parents, reviewed the incident and unanimously determined that H.'s conduct was

a direct manifestation of her disability. The December 2024 conduct was therefore not subject to standard disciplinary consequences under applicable law. The MDR conclusion is not in dispute.

24. H.'s treating physicians documented that her fear of getting in trouble at school was itself interfering with her willingness to take her prescribed medication. Dr. Wendy Hitch, H.'s primary care physician, later noted in medical records that H. feared taking her medication because of what happened 'like last year'.

## C. March 2025: Golf Team Removal Without Individualized Disability Review

25. In February and March 2025, H.'s medication was transitioned from fluoxetine to escitalopram (Lexapro), with the dosage increased to 10 mg. Her treating primary care physician, Dr. Hitch, documented that at this dosage H. was 'coming out of her shell but became impulsive.' The dosage increase was clinically supervised and medically appropriate, but the impulsivity it produced was a foreseeable, documented side effect of the medication adjustment.

26. Approximately two weeks after the 10 mg dosage increase, H. responded to a peer's use of profanity with a profane word of her own. This single verbal exchange resulted in in-school suspension (ISS).

27. On March 7, 2025, at 3:02 p.m., Golf Coach Lauren Hoskins sent an email to H.'s mother, K. B., stating: 'I received my weekly Skyward report for golf team members and noticed that H. received ISS this week for a category 1 behavior incident in one of her classes. As per our golf team expectations, students cannot receive ISS/OSS and remain on the team. In accordance, [H.] will be removed from the golf team for the remainder of the season.' This email was copied, at the time of sending, to Principal Joshua Johnston and Kaitlin

Murrell. Principal Johnston was therefore on actual notice of the removal on the day it occurred.

28. No disability-nexus review was conducted before the removal. No 504 team meeting was convened. No individualized assessment was made regarding whether H.'s behavior which occurred during an active medication adjustment, two weeks after a dosage increase documented to produce impulsivity, was related to her disability. The blanket team rule was applied categorically and without exception. But the absence of a meeting is not the core of the failure. The district had received a detailed written explanation thirty-three minutes after the removal email. It named the disability. It named the medication. It traced the connection between them. No one asked the question in response, whether her disability was relevant at all. The district had every reason to ask it, but declined. As its own written record would confirm five months later, that was not an oversight. It was the policy.

29. On March 7, 2025, at 3:35 p.m., thirty-three minutes after receiving Coach Hoskins's email, K. B. responded to the coaching staff with a detailed written explanation. Mrs. B., a credentialed Speech-Language Pathologist and RESNA Assistive Technology Professional, identified H.'s Generalized Anxiety Disorder diagnosis, explained that H. had recently been placed on an SSRI and that her dosage had recently been increased, described the documented side effects of that medication including emotional blunting and impulsivity, connected those side effects to the conduct that gave rise to the ISS, and explicitly stated that the removal 'cost her the opportunity to play golf something that was truly out of her control.' Mrs. B. requested reconsideration. Principal Johnston remained copied.

30. On March 17, 2025, at 8:49 a.m., Coach Hoskins replied: 'We must ensure that all students adhere to the guidelines set forth for participation in the golf program.' The March 17 response was copied to Principal Johnston, Assistant Principal Amy Hill, Kaitlin Murrell (another golf coach), and Hunter Arnold (Athletic Director). The principal and assistant principal both received Mrs. B.'s disability explanation and affirmatively maintained the blanket rule in response to it. No meeting was convened. No accommodation was offered. No individualized review was performed.

31. On March 26, 2025, Dr. Hitch, H.'s primary care physician, issued a written note to the school documenting H.'s ongoing treatment and medication management and requesting that accommodations be added to her educational plan , specifically including accommodations for academics, sports, and related activities.

32. On March 28, 2025, the district convened a Section 504 meeting. At that meeting, the district's own Functional Behavioral Assessment (FBA) confirmed that H.'s behaviors are directly linked to her anxiety and selective mutism. This FBA finding was made by the district itself, placed in the district's own records, and was in the possession of district personnel at all subsequent times described in this Complaint. Mrs. B. verbally requested at the March 28 meeting that the district adopt a practice of reviewing disability-related factors before imposing disciplinary consequences or removing H. from extracurricular activities. The request was verbally denied at the meeting.

33. The golf removal was never rescinded. H. lost the entire remainder of her season. But the season was not the only thing she lost, and to describe it that way is to mistake the container for what it held. A golf team at that age is not a program. It is the bus ride to the match, the coach who tells you to slow down and trust your swing, the teammate who waits for you

at the ninth hole. It is the first time you win something as part of something. It is the first time you lose and learn that losing does not end you. For H., whose disability makes verbal communication in formal settings nearly impossible, a team was not a supplement to her education. It was one of the few environments where she could be known without having to speak. The district took that from her in an email. No meeting. No review. No one asked whether the medication change two weeks earlier had anything to do with it. H. later told her mother she would not try out again. She did not want to see her coaches. She had been, emotionally burned by what happened. That is not a process failure. That is a harm.

**D.     The District's Written Refusal of Two Disability-Informed Reasonable Modifications to Disciplinary and Extracurricular Decision-Making**

34.     On August 14, 2025, Mrs. B. submitted a formal written accommodation request to the district, directed to Counselor Jessica Cantrell, Assistant Principal Amy Hill, James B., and Principal Johnston, with an attached document explicitly stating that the requested accommodations 'are directly related to incidents from last school year' and contained the two reasonable modifications in their complete written form:

35.     First, it contained a pre-disciplinary review modification: a meeting or discussion to take place before any disciplinary consequence is imposed, for the purpose of determining whether H.'s disability or medication side effects may have caused or contributed to the conduct at issue.

36.     Next, it had a pre-extracurricular-removal review modification: a meeting or discussion to take place before H. is removed from any club, sport, or extracurricular activity, for the purpose of conducting the same individualized disability-nexus assessment.

37. On August 22, 2025, at 1:18 p.m., Principal Johnston issued a written denial of both reasonable modifications. His email was copied to Counselor Cantrell and Assistant Principal Hill. With respect to the pre-disciplinary modification, Johnston wrote: 'there are already federal guidelines and laws in place that require us to have a manifestation determination meeting only when there is a considered change of placement and policies in our Student Code of Conduct which gives principals discretion on disciplining of students.' With respect to the pre-extracurricular-removal modification, Johnston wrote: 'H. must meet the same requirements as her non-disabled peers to participate in extracurricular activities.'

38. Johnston did not deny H. her rights under Section 504. Not consciously, not deliberately, and not in any way he would have named as a denial. He substituted a different standard, called it compliance, and moved on. He told Mrs. B. that manifestation review applies only when a school considers a formal change of placement. That is the IDEA standard. It is not H.'s standard. Under Section 504 and the OCR guidance implementing it, disability-related factors must be considered before disciplinary and exclusionary actions affecting students with disabilities. There is no threshold and no severity qualifier. The obligation is broader than Johnston acknowledged, and the trigger is lower. He cited the IDEA to avoid it. The district already knew this. Eight months before Johnston wrote his August 2025 denial, the district convened a Manifestation Determination Review for H. as a Section 504 student. The form it used asked whether H.'s conduct was caused by her disability or by the school's failure to implement her 504 plan, not her IEP. There was no IEP. The district ran the MDR because it understood the obligation applied to Section 504 students. That prior practice is not incidental. It is an admission. Johnston's August 2025 position is not a correct reading

of federal law. It is a retreat from a standard his own district had *already* accepted, deployed in the service of a conclusion he had already reached.

39. Johnston's statement that 'H. must meet the same requirements as her non-disabled peers to participate in extracurricular activities' is the district's articulation of its institutional policy: students with disabilities seeking to maintain participation in extracurricular activities are not entitled to individualized disability review. This is the categorical policy that had been applied to golf in March 2025, and whose existence as district policy was not established and knowable until Johnston memorialized it in writing on August 22, 2025.

40. On August 22, 2025, at 8:01 p.m., Mrs. B. responded to Johnston's written denial. Her response was precise. She explicitly distinguished between the IDEA manifestation determination Johnston had cited and the Section 504 disability-nexus review she was requesting. She stated: 'I am not asking for a manifestation determination meeting or for immunity from discipline. My request is simply that the team have a discussion or meeting to review whether H.'s behavior may be related to her disability or medication side effects before any disciplinary or exclusionary action is taken.' She then named the golf incident directly: 'Last year, a medication change led to behaviors tied to H.'s disability, which resulted in ISS and automatic removal from golf. That sequence shows a direct link between her disability and her exclusion.' She documented the ongoing harm: 'her middle school golf experience was essentially ruined. She will not try out again, she does not want to see her coaches, and she has been emotionally burned by what happened.'

41. On August 22, 2025, an incident report was documented by Mrs. B., signed on August 25, 2025, recording that during the August 22 meeting Principal Johnston had spoken in a raised voice and in a manner that was unprofessional and demeaning. H. was present

throughout the meeting. After returning home, H. said to her mother: 'Mama, why did you fight with my principal?', and then: 'I know. He wanted to fight you.' After school, Mrs. B. reported that H. did not understand 'why he was being so mean to me when all I wanted to do was make sure her rights were protected.' These are H.'s own contemporaneous statements about the August 22 encounter.

42. On August 24, 2025, at 3:14 p.m., Principal Johnston issued a second written denial. The opening line of Johnston's August 24 email stated: 'We will not accommodate [H.] for the following:', followed by both reasonable modifications listed verbatim. This email was copied to James B.; Jessica Cantrell; Amy Hill; Amber Gailbreath (Johnston's direct supervisor); Bryan Adams; Tracey Burge (Special Education Supervisor); and Becky Adams (504 Coordinator). Johnston's August 24 email stated that he was copying his supervisor and the Special Education supervisor. Johnston stated he would 'reach out to ATC tomorrow.'

43. Amber Gailbreath (Johnston's supervisor), Tracey Burge (Special Education Supervisor), and Becky Adams (504 Coordinator) each received Principal Johnston's August 24 written statement directed to both requested reasonable modifications: 'We will not accommodate [H.]'; and, none of the recipients responded, none corrected Johnston's misrepresentation of federal law, none directed reconsideration, and none initiated any further review. Their silence in the face of a written categorical denial of disability accommodations, issued by a subordinate copying them for supervisory awareness, constitutes ratification of Johnston's policy position as the district's institutional policy.

44. On August 24, 2025, Mrs. B. filed a complaint with the U.S. Department of Education's Office for Civil Rights (OCR) regarding the golf team removal and the denial of the two requested reasonable modifications.

**E. The 2025–2026 School Year: A Pattern of Discriminatory Implementation Failures**

45. The events of the 2025–2026 school year are not a collection of unrelated failures. They have a common source. In March 2025, the district established that it would not ask whether H.'s disability was relevant before it acted. In August 2025, it put that position in writing. That written commitment shaped every meeting, every accommodation decision, every moment when someone in the district had to choose between looking at H.'s disability and looking past it. They chose the latter every time. The accommodations failed the way things fail when no one is permitted to ask why. The physician's directives were disregarded. The harm escalated. This was  not inevitable. All of it was foreseeable. The district had been told. It had already considered disability the right way before. It chose not to again.

46. **Advance Notice Accommodation Not Implemented August 7–8, 2025.** On August 7, 2025, H.'s math teacher used the advance-notice accommodation to inform H. that she would be called on to speak aloud in class the following day. This was the opposite of the accommodation's intended purpose, which is to reduce the anxiety produced by unexpected speaking demands; not to schedule speaking demands in advance. On August 8, 2025, H. had a full panic attack and was unable to attend school. Dr. Friddell provided a medical excuse. This incident establishes, from the first week of the school year, that district staff had not been trained or ignored the purpose or implementation of H.'s accommodations.

47. **Formal Accommodation Denial and Hostile Meeting, August 22–24, 2025.** As described above in Section D, the district denied both requested reasonable modifications in writing on August 22 and August 24, 2025. H. was present for the August 22 meeting and witnessed Principal Johnston's conduct.

48. **Dr. Friddell's Psychiatric Letter of September 11, 2025.** Dr. Colleen S. Friddell, H.'s treating psychiatrist, issued a written letter on September 11, 2025, recommending that H. have immediate access to her cell phone during panic episodes. Dr. Friddell's letter stated that limiting access to the phone exacerbates H.'s anxiety and creates barriers to safely navigating school routines. The district's finalized 504 Plan restricted cell phone use to the guidance office only- a multi-step process that H.'s psychiatrist had specifically identified as creating an undue barrier. The guidance office restriction directly contradicted the physician's written directive.

49. **Cell Phone Accommodation Failures.** On September 8, 2025, prior to Dr. Friddell's letter, H. asked her classroom teacher for permission to use her phone to confirm her bus transportation. The request was denied. H. reported she would never ride the bus again — a concrete example of the barrier created by the district's cell phone policy. On November 4, 2025, during a documented panic episode, H. was tenth in the digital pass queue and was unable to access the guidance office to use her phone. The procedure failed exactly as Dr. Friddell had predicted, in writing, two months earlier.

50. **Academic Harm October 2025.** On approximately October 20, 2025, H. received what her parents described as the worst report card of her life, with D grades across multiple core subjects. These grades were the direct and documented result of the district's failures to implement the missing-assignment communication accommodation, the extended time

accommodation, the redo/retake accommodation, and the freeze and shutdown procedures that H.'s parents had repeatedly requested. H.'s treating psychologist, Terri Crabtree, documented on October 7, 2025, that this was the worst case of school-caused harm.

51. **Written Participation in the 504 Process Denied September 23–October 30, 2025**. H.'s disabilities directly impair her ability to participate in verbal, high-pressure meetings, particularly those in which adults minimize her anxiety, dispute her needs, or adopt an adversarial posture. The September 19, 2025 Section 504 meeting left H. in documented distress. On September 23, 2025, Mrs. B. submitted a written request that future 504 plan revisions and dispute resolution occur in writing, as opposed to in-person meetings, so that H. could meaningfully and safely participate in decisions about her own plan, and so the record would reflect accurate, accessible input from H. and her family. The district did not engage with the accessibility rationale. Principal Johnston reframed the request as a demand for an additional meeting and stated that all issues had already been addressed. On September 30, 2025, Mrs. B. renewed the written participation request, explaining that the meeting environment itself had included dismissive and discriminatory remarks and was harmful to H., and that written collaboration was medically necessary to prevent further harm. The district's October 1, 2025 response did not address the accessibility basis for the request; instead, it transmitted a finalized Prior Written Notice.

52. On October 15, 2025, the district formally declined the written participation request, stating it valued a "collaborative, team-based approach" and that it "concurred" due process was the appropriate next step if the parties disagreed. Mrs. B. responded the same day explaining that H. participates in her own 504 meetings, that her disability prevents reliable verbal participation under adversarial or dismissive conditions, and that written

collaboration was necessary to ensure that H.'s perspective was meaningfully integrated into decisions about her own plan.

53. On October 17, 2025, Mrs. B. again explained that because of Selective Mutism and anxiety, H. cannot always communicate verbally in meeting environments where adults make dismissive remarks, and that the written revision process was necessary to protect her meaningful participation.

54. On October 22, 2025, Mrs. B. formally included "Written Collaboration in Lieu of In-Person Meetings" as a specific, named requested modification in the written parent response matrix submitted to the district. The district's recorded position in that matrix was: "Rejected."

55. On October 30, 2025, the district finalized the 504 Plan and re-issued a Prior Written Notice, without incorporating the written participation modification and without having engaged in the written collaboration process Mrs. B. had repeatedly requested. In the same correspondence, the district characterized the detailed written issues raised by the family between September 29 and October 29 as "yet to be discussed" and redirected Mrs. B. to "options" including mediation and due process as the available remedies. The district thereby closed the 504 plan development process and locked in a plan that had not incorporated accessible, disability-informed input while simultaneously acknowledging an unresolved dispute about access. The district did not pause. It did not adjust the process. It did not offer any modification to allow H. to participate in her own plan in a manner consistent with her disability. It finalized a plan it knew Mrs. B. and H.'s treating physicians had stated would not work, and redirected the family to formal legal proceedings rather than correcting the access barrier. The plan, developed without accessible parental and

student input, failed within weeks: the hallway freeze incidents in November 2025 and the cell phone denial during a panic episode on November 4, 2025 were foreseeable consequences of accommodation provisions that had not been tested, refined, or meaningfully constructed through an accessible process. H.'s psychiatrist pulled her from the school environment in December 2025. The October 30 finalization was not a procedural endpoint. It was the moment the district closed the door on disability-informed collaboration and locked in the conditions that made the subsequent harm predictable.

56. **Restroom Accommodation Failure October 28–30, 2025.** On October 28, 2025, a social studies teacher challenged H.'s use of her restroom accommodation — asking for her last name, warning her she could receive a disciplinary write-up for being out of her seat, and questioning whether she had already used the accommodation that day. H. showed the teacher her digital pass and was ultimately permitted to leave, but the teacher then held the class after the period to 'talk about getting up during class.' H. returned home shaking and in tears, told her mother 'This was my worst fear. I thought he was going to write me up and I'd have ISS' and 'I'm never doing that again. This is why I don't talk to teachers.' She could not eat dinner. She expressed fear of returning to his class. Mrs. B. requested a revision to the accommodation on October 29, 2025. The district finalized the 504 Plan on October 30, 2025, without incorporating the requested change.

57. **The Hallway Freeze and the Failing Grade November 11–17, 2025.** In November 2025, H. missed a school day due to disability-related anxiety, documented by her psychiatrist. Upon her return, the district placed H. alone in the hallway on November 11 and again on November 12, 2025, to make up a math assessment. On both days, H. froze and was unable to begin the test. She later disclosed to her mother: 'I was worried I was going to get shot

up in the hallway all by myself.' Her inability to initiate the assessment was not defiance. It was a neurologically documented freeze response triggered by the disabling combination of isolation, perceived threat, and an unfamiliar and uncontrolled environment. This was exactly the kind of environment her 504 Plan was designed to address. On the third day, November 13, 2025, H. was placed in the classroom and given approximately fifteen minutes, the duration of her extended time accommodation. She answered seven questions. She got all seven correct. She received a failing grade of 35 because incomplete items were counted against her. No freeze protocol existed. No provision for a disability-based retake was applied. The teacher who administered the assessment confirmed in a November 15, 2025 email that H. had froze for two days in a row, that she had been placed in the hallway, that extended time alone did not address freeze episodes, and that a retake was not offered because H. had 'already missed almost 3 days making up the test.' The district's own documentation confirms that the failing grade was the direct and foreseeable product of its accommodation failures.

58. **Administration's Intent to Question H. Without Parent Present November 18, 2025.** On November 18, 2025, Assistant Principal Amy Hill called Mrs. B. to report secondhand 'hallway gossip' involving H. and indicate that administration intended to question H. regarding an alleged statement. Principal Johnston confirmed this intent in a subsequent written email. H. does not have a boyfriend and denied making any threatening statement. Upon being informed that administrators planned to question her, H. immediately began shaking and crying, a documented disability response to anticipated confrontation with authority figures. Both H.'s psychiatrist and psychologist had documented that

administrative questioning without parental support is a known disability trigger for H., capable of producing a severe freeze or panic attack.

59. **Academic Crisis and December 2025 School Absence.** On December 2 and 3, 2025, a combination of a makeup test incident and a classroom announcement triggered acute panic in H.. She was unable to attend school. The district's accommodation failures had by this point created a feedback loop: each accommodation failure produced academic harm, each instance of academic harm produced anxiety, and each increase in anxiety made H.'s disability presentation more severe.

## F. Homebound Did Not Stop It.

60. On December 9, 2025, H.'s parents submitted a homebound instruction packet to the district. Dr. Friddell certified the medical necessity of homebound instruction. The district approved homebound placement. However, simultaneously and without any physician order, the district imposed a blanket extracurricular exclusion on H. during homebound placement that prohibited her from attending any school extracurricular activity or social event, including the school dance. This exclusion was not directed by H.'s physicians. It was a district policy decision, applied without individualized review, that replicated in its structure the identical categorical exclusion the district had applied to golf in March 2025. The district imposed this blanket exclusion without any physician order directing it, without individualized review, and in direct contradiction to written guidance from H.'s treating psychiatrist that after-school socialization was an important component of her recovery. The exclusion replicated, in its structure and in its indifference, the categorical approach the district had applied to golf eight months earlier. It also produced an outcome that Tennessee law does not permit even for students with no connection to the district at

all. Under T.C.A. § 49-6-3050(e), an independently registered homeschool student residing in West Wilson Middle School's territory has a statutory right to try out for the school's golf team. H. is an enrolled student of the district. She was placed on homebound by medical necessity, as a direct consequence of the district's own accommodation failures. The district extended to non-enrolled students a right it simultaneously denied to her. It is visible discrimination and not an administrative coincidence.

61. On December 18, 2025, the homebound teacher arrived for H.'s first homebound instruction session. The homebound teacher required H. to appear on camera. H., whose disability produces severe anxiety in conditions of visual social performance scrutiny, had a full panic attack. Mrs. B. ended the session. The district had been told, repeatedly and in clinical detail, precisely why requiring camera appearance would produce this outcome. It had no protocol in place to prevent it.

62. On December 30, 2025, Dr. Friddell issued written medical directives for homebound instruction safety that were specific, clinical, actionable directives that, if followed, would allow H. to receive homebound instruction without triggering the same panic response. The district received these directives.

63. On January 19, 2026, Dr. Friddell issued a second written addendum providing a specific phased return schedule, communication protocols, and explicit direction that missed homebound sessions be treated as medically excused. The district received this addendum.

64. On January 23, 2026, notwithstanding the physician directives in its possession, the district issued a threatening formal attendance enforcement letter to H.'s parents threatening juvenile court proceedings based on H.'s absences. The January 23 letter did not address Dr. Friddell's written medical directives. It did not offer any individualized review. It

applied the district's attendance enforcement mechanism without exception, without medical review, and without any acknowledgment that the absences at issue had been medically excused by a treating psychiatrist.

65. On February 2-3, 2026, the district partially corrected its attendance records but limited the correction to only two dates. It denied H.'s request to attend the school dance, citing district policy. No physician had ordered her exclusion from the dance. No individualized assessment was conducted. The treating psychiatrist had stated in writing that after-school socialization was important to H.'s healing. The district did not engage with that directive. It applied the categorical exclusion and moved on. A school dance is not a privilege. At thirteen, it is a social passage. It is the kind of ordinary experience that a student either has or doesn't, and that absence is not recovered. The district's policy took it from her without asking whether it should.

66. On February 4–5, 2026, the district scheduled a 504 meeting and stated in writing that it would proceed with the meeting without K. B.'s participation if she was unable to attend at the time the district had selected.

**G. Formal Notice. No Response.**

67. On September 18, 2025, Mrs. B. sent a formal written letter to Jeff Luttrell, Director of Schools for Wilson County Schools, with the subject line: 'Section 504 and ADA Violations — H. B.' The letter explicitly named the golf removal, the denial of the pre-disciplinary modification, and the denial of the pre-extracurricular-removal modification as federal violations. The letter cited 34 C.F.R. Part 104 and 28 C.F.R. Part 35 by name. It stated explicitly that it was 'formal documentation for any federal review or legal action.' It referenced the OCR complaint already on file. It attached, as Appendix A, the complete

golf chain and August accommodation correspondence, and, as Appendix B, a legal analysis of the § 504 violations with regulatory citations.

68. Director Luttrell forwarded the September 18 letter to the Special Education Director and to the Wilson County Schools Staff Attorney. No one contacted Mrs. B until replying to an email from her October 3. The Special Education Director promised to contact Mrs. B. and did not. The Staff Attorney received written notice of alleged federal violations in an active OCR matter and did not respond. As of the date of this Complaint, no substantive response to the September 18, 2025 formal notice has been received.

69. The district's attorneys' receipt of a written formal notice identifying Section 504 and ADA violations with regulatory citations, in a matter with an active OCR complaint, and their failure to respond, is further evidence of the institutional deliberate indifference that pervades this record.

## H. The District's Own FBA Contradicted by Its Principal

70. As noted above, the district's own Functional Behavioral Assessment conducted in Spring 2025, concluded that H.'s behaviors are directly related to her anxiety disorder. In addition, prior to the September 19, 2025 Section 504 meeting, H.'s treating psychiatrist provided written guidance to her 504 team dated September 11, 2025, explaining that H.'s anxiety and selective mutism significantly impair her ability to access education without support, that she may experience "freezing or emotional shutdowns" during class or assessments that are disability related and "not willful noncompliance", that interruptions to instructional time can exacerbate anxiety, that selective mutism creates barriers to requesting help or clarification, and that H. "must be allowed to use her phone in urgent or emergency situations" because limiting access creates barriers to safely navigating school

routines. Despite possessing both the district's own FBA finding and the psychiatrist's written guidance, the district's principal stated in the Prior Written Notice issued after the September 19, 2025 meeting (dated October 1, 2025 and re-sent on October 30, 2025) that he "does not see H.'s anxiety at school." The principal's stated non-observation, contrary to both district and medical documentation, was then used to justify refusing disability-informed accommodations intended to prevent foreseeable harm. This contrast supports Plaintiffs' allegation of deliberate indifference. The gap between what the district's own FBA concluded and what its principal was willing to recognize is a microcosm of the deliberate indifference this case presents.

## CAUSES OF ACTION

## COUNT I

## SECTION 504 OF THE REHABILITATION ACT OF 1973 29 U.S.C. § 794

## Discrimination on the Basis of Disability

71. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

72. Section 504 of the Rehabilitation Act provides that no otherwise qualified individual with a disability shall, solely by reason of her disability, be excluded from participation in, denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

73. Defendant Wilson County Board of Education is a recipient of federal financial assistance within the meaning of 29 U.S.C. § 794(b).

74. H. G. B. is an otherwise qualified individual with a disability within the meaning of 29 U.S.C. § 705(20). Her Generalized Anxiety Disorder and Selective Mutism substantially limit major life activities including communication, learning, social interaction, and

emotional regulation. These limitations are most acute in the school settings where self-advocacy is required and least accessible to her.

75. Defendant discriminated against H. on the basis of her disability in the following respects, each of which constitutes an independent basis for liability and all of which are part of a continuous and interconnected pattern of discriminatory conduct:

76. (a) Golf Team Removal and Application of Categorical Discriminatory Policy. In March 2025, Defendant applied its institutional policy of categorical extracurricular exclusion to H., who had engaged in conduct that was a foreseeable and a documented side effect of her prescribed psychiatric medication. No disability-nexus review was conducted, no 504 meeting was convened, and no accommodation was offered, despite receiving written notice from a credentialed professional on the day of the removal identifying the connection between the medication adjustment and the conduct. The absence of a meeting is not the violation. The violation is simpler. No one asked whether her disability was relevant. The district had every reason to ask. It declined. The Defendant's principal articulated and memorialized this categorical policy in writing in August 2025, 'H. must meet the same requirements as her non-disabled peers to participate in extracurricular activities', and Defendant's supervisors ratified it. What happened in March was not an outlier. It was the policy.

77. (b) Categorical Denial of Reasonable Modifications. In August 2025, Defendant categorically refused to include in H.'s 504 Plan two reasonable modifications, a pre-disciplinary disability-nexus review and a pre-extracurricular-removal disability-nexus review, all while misrepresenting the applicable federal standard and relying on an IDEA provision that has never applied to H.

78. (c) Accommodation Design and Implementation Failures. Defendant designed and implemented 504 accommodations in a manner that was facially inaccessible to a student with Selective Mutism, for example, requiring self-advocacy under conditions of stress that the accommodation was designed to address, including requirements that H. initiate requests for help, clarification, redo opportunities, or extended time during periods of anxiety/shutdown, and requirements that the family initiate within rigid time windows; and failed to implement physician-directed protocols despite repeated written notice of their medical necessity.

79. (d) Hallway Freeze, Freeze Response and Academic Penalty. Defendant placed H. alone in a hallway for two consecutive days during a makeup assessment, without any defined freeze/shutdown protocol. H. experienced a disability-related freeze response and was unable to initiate the assessment in that setting. Defendant then imposed an academic penalty reflecting incompletion rather than mastery, including a failing grade despite correct responses on the portion she was able to complete.

80. (e) Homebound Exclusion Without Physician Order. Defendant imposed a blanket extracurricular exclusion on H. during her homebound placement without any physician order directing such exclusion, without individualized review, and contrary to the written directive of H.'s treating psychiatrist that after-school socialization was an important component of her recovery. The exclusion was not directed by any physician. It was a district policy decision, applied categorically, that replicated in its structure and its indifference the same approach the district had applied to golf eight months earlier. Under T.C.A. § 49-6-3050(e), non-enrolled homeschool students residing within the district's territory hold a statutory right to participate in interscholastic athletics at West Wilson

Middle School, including golf. H., an enrolled district student placed on homebound as the direct result of the district's own accommodation failures, was denied participation the statute guarantees to students with no enrollment relationship to the district whatsoever. The district found a way to include students who don't belong to it. It could not find a way to include one who did.

81.    (f) Attendance Enforcement Over Medical Directives. Defendant issued attendance enforcement correspondence threatening juvenile court proceedings for absences that H.'s treating psychiatrist had medically excused in writing, which were in the district's possession, and which the district declined to acknowledge or review.

82.    (g) Failure to Modify the 504 Process to Allow Accessible Participation. Defendant refused to modify the procedures governing H.'s own 504 plan development to allow her to participate in a manner consistent with her disability. H.'s Selective Mutism and Generalized Anxiety Disorder directly impair her ability to engage in verbal, adult-dominated, adversarial meetings,  the precise setting in which her 504 plan was developed and revised. Despite written requests on September 23, September 30, October 15, October 17, and October 22, 2025, and a formal written inclusion of "Written Collaboration in Lieu of In-Person Meetings" in the October 22 parent response matrix, Defendant refused to modify the plan's development process to permit written participation. Defendant did not challenge the factual or medical basis for the request. It declined on institutional preference grounds, stating it valued a "collaborative, team-based approach," and directed the family to mediation and due process as alternatives. On October 30, 2025, Defendant finalized H.'s 504 Plan without incorporating the written participation modification and without having engaged in the accessible written collaboration process Mrs. B. had repeatedly

requested, locking in a plan developed without meaningful, disability-informed input from H. or her parent. Section 504 and its implementing regulations require that recipients provide qualified individuals with disabilities with equal opportunity to participate in and benefit from programs and services, including the procedural mechanisms through which disability-related decisions are made. 34 C.F.R. § 104.4(b)(1)(ii). A student with a communication disability has the right to participate in her own educational planning through a process that is accessible to her. Defendant's refusal to modify the process was not a neutral procedural choice. It was the application of a standard, verbal-meeting model to a student whose disability made that model inaccessible, and whose participation in her own plan was undermined as a direct result.

83. Defendant's conduct constitutes intentional discrimination within the meaning of Section 504. Defendant had documented actual notice of H.'s disability, its functional impacts, and the harm caused by the district's failures from at least March 7, 2025 forward. Despite that notice and the district's own FBA confirming the disability nexus Defendant refused to implement the accommodations requested, failed to train its staff to implement the reasonable modifications adopted, and failed to respond to repeated written notice of ongoing harm. Defendant had actual notice through Parent's repeated written warnings and physician documentation that H.'s disability predictably produces freeze/shutdown responses during assessments and that staff needed a clear, usable protocol. Defendant nonetheless finalized and relied on procedures that were not workable in real time and were not implemented consistently, resulting in precisely the type of freeze-related assessment failure and academic penalty that had been predicted.

84. Defendant's conduct also constitutes deliberate indifference within the meaning of Section 504. Supervisory personnel with authority to correct the violations, including Amber Gailbreath (Johnston's supervisor), Tracey Burge (Special Education Supervisor), Becky Adams (504 Coordinator), and Jeff Luttrell (Director of Schools), received written notice of the violations and failed to act.

85. As a direct and proximate result of Defendant's discrimination, H. has suffered educational harm including grade regression, failing grades caused by accommodation failures, loss of academic opportunities, and loss of extracurricular participation across multiple seasons. She has suffered emotional and psychological harm documented by her treating psychiatrist, psychologist, and primary care physician, including worsening psychiatric symptoms, regression in therapeutic progress, and internalized fear of school. She has been placed on homebound instruction as a direct medical consequence of the district's conduct. Her psychiatrist has documented the connection between the school environment and the deterioration of H.'s clinical presentation.

86. Plaintiffs seek compensatory damages, injunctive relief, declaratory relief, and attorneys' fees and costs pursuant to 29 U.S.C. § 794a.

## COUNT II

## TITLE II OF THE AMERICANS WITH DISABILITIES ACT42 U.S.C. § 12131 ET SEQ.

### Discrimination in Access to Public Programs and Activities

87. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

88. Title II of the ADA provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132.

89. Defendant Wilson County Board of Education is a 'public entity' within the meaning of 42 U.S.C. § 12131(1)(B).

90. H. G. B. is a 'qualified individual with a disability' within the meaning of 42 U.S.C. § 12131(2).

91. The educational programs, extracurricular activities, and student services offered by Defendant, including golf team participation, after-school activities, school dances, and academic instruction, constitute 'services, programs, or activities' of a public entity within the meaning of Title II.

92. Title II requires that public entities make reasonable modifications to policies, practices, and procedures where necessary to avoid discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(7). The pre-disciplinary and pre-extracurricular-removal disability-nexus reviews requested by H.'s parents are reasonable modifications. They require nothing more than a brief meeting before a consequence is imposed and that the district categorically refused to make and further declined in writing.

93. Title II further provides that a public entity shall administer its programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. 28 C.F.R. § 35.130(d). Defendant's categorical exclusion of H. from extracurricular activities in golf; in after-school programs; and in school social events, without individualized review is inconsistent with this integration mandate.

94. Defendant's conduct, as described herein, constitutes discrimination against H. by reason of her disability in violation of Title II of the ADA. The conduct includes: the categorical

refusal to modify the extracurricular participation policy to permit disability review; the failure to modify the disciplinary procedure to permit disability review before consequences are imposed; the failure to provide accessible accommodations to a student whose disability makes self-advocacy impossible under the conditions that trigger self-advocacy requirements; and the imposition of categorical blanket exclusions without individualized review.

95. As a direct and proximate result of Defendant's violations of Title II, H. has suffered the damages described under Count I. Plaintiffs seek compensatory damages, injunctive relief, declaratory relief, and attorneys' fees and costs pursuant to 42 U.S.C. § 12205.

## COUNT III

### 42 U.S.C. § 1983

### Deprivation of Constitutional Rights Under Color of State Law

96. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

97. Defendant Wilson County Board of Education, acting under color of state law through its policymakers, supervisors, and employees, deprived H. G. B. and K. S. B. of rights secured by the Constitution of the United States, in violation of 42 U.S.C. § 1983.

**A. State-Created Danger- Substantive Due Process Rights**

98. H. had a substantive due process right under the Fourteenth Amendment to be free from state-created dangers, the very affirmative state actions that placed her in a position of danger that she would not otherwise have faced, or that rendered her more vulnerable to harm.

99. Defendant created a danger to H. by placing her alone in an isolated school hallway for two consecutive days during the November 2025 makeup assessment without any

monitoring, without any freeze protocol, and without any safety procedure, despite possessing clinical documentation that H. has documented freeze responses triggered by perceived threat and isolation. When placed in the hallway, H.'s nervous system entered a freeze response, and she later reported that she had feared being shot while alone there. Placing a medically documented freeze-response student, without protocol or monitoring, in the specific environmental condition that triggers her freeze response, is an affirmative state act that made H. demonstrably less safe than if the district had simply done nothing.

100. Defendant's conduct in creating this danger was the result of deliberate indifference, not error, not oversight, but the foreseeable consequence of a district that had refused to implement freeze protocols despite repeated written requests and clinical documentation of their necessity.

## B. Equal Protection/Academic Success Class Comparator

101. H. G. B. was subjected to disparate procedural treatment in her access to Academic Success, a general academic support class available to students through routine parent permission and standard scheduling. In early September 2025, Mrs. B. requested H.'s placement in Academic Success, communicating urgency to Counselor Cantrell on or around September 5, 2025, and reiterating that urgency in her September 16, 2025 crisis email. The district declined to act on that request without first holding a formal 504 meeting instead conditioning H.'s access to a generally available support on an additional procedural hurdle not required of non-disabled students seeking the same placement. When Mrs. B. questioned the basis for that requirement, Principal Johnston stated that Academic Success placement is "case-by-case" and that there is "no policy", hence confirming that the gatekeeping was discretionary. Discretionary gatekeeping applied to a disabled student

whose parent is actively advocating is facially susceptible to discriminatory application and constitutes unequal treatment on the basis of disability. The district's selective use of process is not incidental. The same district that imposed a meeting requirement before granting H. access to academic support waived any equivalent requirement before removing her from extracurricular activities. Process was a barrier when it controlled access to something H. needed. Process was abandoned when it would have protected her. That asymmetry is the equal protection violation.

## C. K. S. B.'s Individual Liberty Interest

102. Plaintiff K. S. B., individually, had a constitutionally protected liberty interest in directing the medical care and treatment of her minor child, H.. The Fourteenth Amendment's Due Process Clause protects the fundamental right of parents to make decisions regarding the care, custody, and control of their children, including decisions about medical treatment. This is not a derivative claim based on H.'s rights. It is Mrs. B.'s own constitutionally protected right, separately actionable under § 1983.

103. Defendant, through its agents, interfered with Mrs. B.'s constitutional right in the following respects: (a) by refusing to implement the psychiatric directives of H.'s treating physicians and substituting the district's own judgment for that of the treating physician regarding the conditions necessary for H.'s safe participation in school and homebound instruction; (b) by imposing a blanket extracurricular exclusion during homebound placement without any physician order directing such exclusion, thereby overriding the medical judgment of the treating physician who had approved homebound while not ordering extracurricular exclusion; and (c) by threatening juvenile court proceedings for absences that the treating

physician had medically excused, thereby using state legal process to coerce compliance with district attendance policy over and against a physician's written medical direction.

**D. Monell Municipal Liability**

104. Defendant Wilson County Board of Education is liable for the constitutional violations described in Count III under the doctrine established in Monell v. Department of Social Services, 436 U.S. 658 (1978), and its progeny, on two independent grounds:

105. Theory 1 -- Ratification. Ratification occurred at two levels, on two separate occasions, by officials whose authority over Section 504 compliance is not contestable. First, on August 24, 2025, Principal Johnston's written statement, "We will not accommodate H. for the following:" and it was transmitted to, among others, Becky Adams, the district's Section 504 Coordinator with district-wide authority over 504 compliance, and Bryan Adams, her direct supervisor at the district level. Johnston's email explicitly stated he was copying these officials *for supervisory awareness*. Both received written notice that a building principal had categorically denied disability accommodations in writing, had misrepresented the governing federal standard, and had declared that a student with a disability must meet the same requirements as her non-disabled peers to participate in extracurricular activities. Neither responded. Neither corrected Johnston's misstatement of federal law. Neither directed reconsideration. Neither initiated any further review. The district's own 504 Coordinator, whose institutional function is to ensure compliance with Section 504 across Wilson County Schools, received a written categorical denial of 504 accommodations from a subordinate and took no action. That silence is ratification. It is the district's 504 Coordinator endorsing, by inaction, a principal's decision to deny the very protections she is charged with ensuring.

Next, on September 18, 2025, Mrs. B. sent a formal written notice to Jeff Luttrell, Director of Schools identifying the golf removal, the denial of the two reasonable modifications, and the August 24 written denial as violations of Section 504 and the ADA, with full regulatory citations and an active OCR complaint already on file. Luttrell forwarded that notice to the Special Education Director and the district's Staff Attorney. Neither responded. Neither corrected the record. Neither directed any action. The Director of Schools received a formal written notice of federal disability rights violations, with legal analysis attached, in a matter with an active federal complaint, and the district's institutional response was silence. That silence, at the level of the district's chief executive and its legal counsel, constitutes ratification of the district's policy position as the official policy of the Wilson County Board of Education.

106. Theory 2 — Categorical Application of Extracurricular Participation Policy Without Individualized Review. Principal Johnston's written statement that H. "must meet the same requirements as her non-disabled peers to participate in extracurricular activities" was not an individual judgment call. It was the articulation of a district-wide institutional policy: that students with disabilities are not entitled to individualized disability review before exclusionary extracurricular action. That policy was applied to H. in March 2025 when she was removed from the golf team without review. It was memorialized in writing in August 2025. It was ratified by Johnston's supervisors as described above. When a policymaker applies a facially neutral policy categorically to a student with a disability, in writing, and the district's supervisors ratify that application, it is the district's policy that has caused the constitutional harm.

107. Categorical Application of Homebound Extracurricular Exclusion Without Individualized Review. The district applied Board Policy 4.206 to impose a blanket extracurricular exclusion on H. during her homebound placement without any physician order directing such exclusion, without individualized review, and contrary to the written guidance of H.'s treating psychiatrist that after-school socialization was an important component of H.'s recovery. The policy was applied categorically. No one asked whether its application to H. was appropriate given her medical circumstances, her physician's directives, or the fact that her homebound placement was itself a direct consequence of the district's own accommodation failures. The categorical application of that policy, without individualized review, is a separate and independent instance of policy-driven constitutional harm.

108. Plaintiffs seek compensatory damages under Count III. Punitive damages are sought against Defendant to the extent available.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant Wilson County Board of Education, and grant the following relief:

A. Compensatory damages for H. G. B.'s educational harm, including grade regression, failing grades, loss of academic opportunities, loss of extracurricular participation, loss of two seasons of golf, and the loss of school social events;

B. Compensatory damages for H. G. B.'s emotional and psychological harm, including documented worsening of her psychiatric condition, regression in therapeutic progress, and the internalized fear and trauma caused by the district's conduct, as documented by her treating psychiatrist, psychologist, and primary care physician;

C.    Compensatory damages for K. S. B. individually for interference with her constitutionally protected liberty interest in directing the medical care of her minor child and for the costs of advocacy, therapy, and related expenses proximately caused by the district's conduct;

D.    Injunctive relief requiring Defendant to implement H.'s 504 Plan accommodations as requested by her treating physicians, including the pre-disciplinary and pre-extracurricular-removal disability-nexus review modifications; to develop and implement a written freeze and shutdown protocol for assessments; to adopt physician-compliant homebound instruction protocols; and to comply with Dr. Friddell's written medical directives;

E.    Injunctive relief requiring Defendant to provide appropriate staff training on the implementation of Section 504 accommodations for students with anxiety disorders and selective mutism, including training on the purpose and operation of each accommodation in H.'s 504 Plan;

F.    Declaratory judgment that Defendant's conduct as described herein violated Section 504 of the Rehabilitation Act, Title II of the Americans with Disabilities Act, and 42 U.S.C. § 1983;

G.    Court-ordered monitoring of Defendant's compliance with the injunctive relief granted herein;

H.    Attorneys' fees and costs pursuant to 29 U.S.C. § 794a, 42 U.S.C. § 12205, and 42 U.S.C. § 1988;

I.    Such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues so triable.

/s/ Michael F. Braun

_____

MICHAEL F. BRAUN (032669)
5016 Centennial Boulevard
Suite 200
Nashville TN 37209
(615) 378-8942
mfb@braun-law.com